## NO. 95-CA-01119-SCT

*J. STEPHEN WRIGHT*

*v.*

*CAROL P. STANLEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/95 |
| TRIAL JUDGE: | HON. EDWARD G. CORTRIGHT JR. |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES A. BECKER, JR. |
| | CECIL M. HEIDELBERG |
| ATTORNEY FOR APPELLEE: | S. DENNIS JOINER |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 6/19/97 |
| MOTION FOR REHEARING FILED: | 7/3/97 |
| MANDATE ISSUED: | 8/22/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. J. Stephen Wright filed a petition to modify the divorce decree between him and his former wife Carol P. Stanley. Steve sought custody of his three sons Daniel, Michael, and Nathan. Carol filed a cross-petition seeking various modifications of the divorce decree primarily related to visitation and child support. She also sought attorney's fees and an order holding Steve in contempt for allegedly interfering with the childrens' relationship with her. During the trial, Steve abandoned his claim for custody for Daniel and Nathan, but retained his claim for Michael. The Chancellor entered a written opinion and order denying Steve's Petition for Modification of Judgment. He also ordered Steve to increase child support, pay Carol's attorney's fees, and he restricted Steve's visitation rights. From that decision, Steve appeals to this Court and assigns as error the following:

> **I. THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE TAPE-RECORDED CONVERSATIONS BETWEEN STEVE WRIGHT AND HIS CHILDREN WHICH WERE INTERCEPTED BY CAROL**

**STANLEY WITHOUT THE CONSENT OF STEVE WRIGHT OR HIS CHILDREN.**

**II. THE CHANCELLOR ERRED BY NOT COMPELLING CAROL STANLEY TO PRODUCE ALL TAPE-RECORDED CON-VERSATIONS SHE INTERCEPTED BETWEEN STEVE WRIGHT AND HIS CHILDREN.**

**III. THE CHANCELLOR'S DECISION TO DENY STEVE WRIGHT'S PETITION FOR MODIFICATION OF CUSTODY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**IV. THE CHANCELLOR'S ORDER AWARDING ATTORNEY'S FEES AND INCREASED CHILD SUPPORT TO CAROL STANLEY WAS ERRONEOUS.**

## STATEMENT OF FACTS

¶2. On August 19, 1991, the Chancery Court of Madison County entered a final judgment of divorce between Carol and Steve Wright awarding custody of their three children to Carol. After the divorce, both Steve and Carol remarried. Steve and Jane Ann Wright live in their home with their two children. Carol and Bill Stanley live in their home with Daniel, Michael, and Nathan, the sons of Carol and Steve.

¶3. Steve filed his Petition for Modification of Judgment on January 19, 1995, seeking as his sole relief primary custody of all three children and a corollary ruling that he would be relieved of child support obligations. Steve's basis for filing the Petition was that Bill Stanley's marriage to Carol constituted a change in material circumstances warranting a change in child custody. Steve specifically alleged that the children were being emotionally abused by being called foul and insensitive names. He further alleged that Bill Stanley is a hot-tempered individual given to fits of rage, who cursed the children and was undermining their self image.

¶4. After Steve filed his petition, he engaged Dr. Wood Hiatt, a local psychiatrist specializing in working with children and families, to interview him and his children and then to render an opinion as to whether their best interests would be served by a change in custody. Dr. Hiatt stated in his opinion that only Michael's best interest would be served by the custody change. Thereafter, Steve limited his custody request to Michael.

¶5. Dr. Hiatt's opinion was based in part on the fact that Michael had expressed a consistent desire to live with Steve and Jane Ann, his stepmother. He had also expressed that he did not want to live with Bill Stanley. Dr. Hiatt also found that Michael was thriving everywhere except in his mother's home. He was a straight A student, a good athlete, and involved in many activities. He opined that the source of Michael's behavioral problems in the home was a result of the "fatal" relationship between Michael and Bill. Dr. Hiatt's final basis for his opinion was that he perceived Carol and Bill as blaming all of Michael's problems on Steve's interference, failing to take any responsibility themselves.

¶**6.** In response to Steve's petition, Carol filed a counterclaim. In it she sought: (1) to have the amount of child support fixed in the divorce judgment increased; (2) to have Steve's times and dates for visitation with his children specifically delineated; (3) to place time limitations on Steve's

telephone conversations with the children; (4) to have Steve remain in his automobile when picking up and delivering the children for visitation; (5) to limit Steve's presence at her home during pick up and delivery of the children to not more than five minutes; (6) to eliminate from the divorce judgment the requirement that Carol give Steve notification prior to incurring necessary medical expenses for the children; (7) to hold Steve in civil contempt of court for attempting to undermine Carol's relationship with the children and her husband; and (8) a reasonable attorney's fee for the service of her attorney.

¶7. The case was tried on August 22 and 23, 1995. Most of the testimony related to whether Michael's best interest would be served by a change in custody, and whether Bill's presence in the home was having an adverse effect on Michael warranting such change. Part of Carol's evidence at trial consisted of two tape-recorded conversations between Steve and his children, which is the basis of this appeal. The Chancellor entered his written opinion and order on September 3, 1995, denying Steve's Petition for Modification of Judgment and granting the following relief to Carol: (1) Child support was increased from $400.00 per child per month to $440.00 per child per month. (2) Paragraph 23(x) of the divorce decree allowing undefined visitation rights was eliminated. The Chancellor limited visitation to specific times set out in the decree unless Carol from time to time agrees to grant additional privileges. (3) Telephone conversations were limited to two calls per day per child prior to 9:00 p.m. (4) Steve was restrained from entering Carol's yard or home. (5) Carol may now incur reasonable medical, dental, or optical expenses for each child up to $100.00 per child per month without notifying Steve in advance. (6) Carol was awarded attorney's fees in the amount of $7,800.00.

## DISCUSSION OF LAW

### I.

¶8. The first assignment of error raised on this appeal by Steve is that the Chancellor committed reversible error by admitting into evidence tape-recorded conversations between Steve and his children which were intercepted by Carol without consent. Steve challenges the admissibility of these tapes under both federal and state law. He contends that the tapes colored the ruling of the Chancellor such that he was unable to consider the best interest and welfare of Michael.

¶9. The standard by which this Court reviews a trial judge's decision to admit evidence was stated in this Court's decision in *Stewart v. Stewart*, 645 So. 2d 1319 (Miss. 1994). There, quoting *Century 21 Deep South Property v. Corson*, 612 So. 2d 359 (Miss. 1992), the Court said, "[t]he relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused. [citations omitted] Unless the trial judge's discretion is so abused as to be prejudicial to a party, this Court will not reverse his ruling." *Id* at 1320 citing *Century 21 Deep Sout Property*, at 369.

¶10. Steve's first argument is that Carol's taping of his conversations with his children violates federal law. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § § 2510-2522 ("Title III"), deals with wire, electronic and oral communications interception. It generally prohibits interception and disclosure of wire, oral and electronic communications except those specifically provided for in the Act. 18 U.S.C. § 2511. If communications are intercepted in violation of Section 2511, they are prohibited from being used as evidence in a trial by Section 2515.

¶11. Section 2511, in pertinent part, reads:

> Interception and disclosure of wire, oral, or electronic communications prohibited
>
> (1) Except as otherwise specifically provided in this chapter any person who --
>
> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication
>
> . . . .
>
> shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 2511. If a communication is intercepted in violation of Section 2511, then Section 2515 prohibits that intercepted communication from being used as evidence in a trial.

¶12. First, Steve cites *Kratz v. Kratz,* 477 F.Supp. 463 (E.D.Pa. 1979), and *Heggy v. Heggy,* 944 F.2d 1537, 1540 (10th Cir. 1991), *cert. denied*, 503 U.S. 951 (1992), to support his position that Carol meets the definition of "any person." *Kratz* and *Heggy* support the proposition that "any person" means "any individual" as it is defined in Title III. We agree that Carol is "any person" within that meaning. The next issue is whether Carol "intentionally intercepted any wire communication." 18 U.S.C. § 2511(1)(a). The Fifth Circuit addressed this issue in *Briggs v. American Oil Filter Company,* 630 F.2d 414, 417 (5th Cir. 1980), and said that a telephone conversation is a wire communication. Finally, did Carol intentionally intercept these wire communications? Title III defines intercept as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). In interpreting "intercept", the Fifth Circuit has said,

> [i]f a person secrets a recorder in a room and thereby records a conversation between two others, an "acquisition" occurs at the time the recording is made. The acquisition itself might be said to be "aural" because the contents of the conversation are preserved in a form which permits the later aural disclosure of the contents.

*United States v. Turk,* 526 F.2d 654 (5th Cir. 1976), *cert. denied*, 429 U.S. 823 (1976). It is obvious that Carol intercepted these wire communications by acquiring their contents through the use of an "electronic, mechanical, or other device" within the meaning of the intercept definition. Electronic, mechanical, or other device is defined under Title III as:

> [a]ny device or apparatus which can be used to intercept a wire, oral, or electronic communication other than --
>
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; . . .

18 U.S.C. § 2510(5).

¶13. Steve argues that Carol's voice-activated recorder is an apparatus which can be used to intercept a wire communication, because that is exactly what it did. This is true. However, there are exceptions to the definition. If Carol's act of taping falls within those exceptions, she did not "intercept" wire communications within the meaning of § 2511.

¶14. Carol argues that her interception and tape-recording of Steve's conversations with his children falls within the business-use exception to the definition of "electronic, mechanical, or other device." 18 U.S.C. § 2510(5)(a)(i). She cites this Court's decision in *Stewart v. Stewart,* 645 So. 2d 1319 (Miss. 1994), in support of her argument. In that case, a husband taped a telephone conversation of his wife with another woman. The conversation referred to sexually explicit contact that had taken place between the two of them. The wife admitted that she had known that her husband was taping her conversations and, therefore, she decided to "give him an earful." The husband sought to admit the tape as evidence in a divorce proceeding. The court allowed the tape to be admitted on the basis of the wife's consent. At the end of the trial, the husband was granted custody of the child of the marriage, and the wife appealed arguing that the lower court erred in admitting the tape-recorded conversation into evidence. This Court affirmed the lower court, holding that the husband's taping of his wife in the marital home did not violate federal law and was clearly exempted by 18 U.S.C. § 2510(5)(a)(1). The Court reasoned that "§ 2515 does not prohibit a person from taping a conversation, within his own home, that he is legally authorized to listen to by picking up an extension phone." *Id.* at 1321.

¶15. This Court also based its holding on the fact that the wife in *Stewart* had consented to the taping by her husband. The wife argued that she did not consent, but the Court found that her testimony indicated that she had a feeling her husband had the phone "rigged" and, therefore, she wanted to "give him an earful," was consent under 18 U.S.C. § 2511(2)(d). That section states:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). The Court said that even if Title III did apply to this situation, which it held did not, the wife consented to the taping and, therefore, it was authorized and the husband was not in violation of the law. *Stewart*, 645 So.2d at 1322.

¶16. The Court in *Stewart* was persuaded by the decisions of the Second and Fifth Circuit Courts in *Anonymous v. Anonymous*, 558 F.2d 677 (2nd Cir. 1977), and *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974), *cert denied*, 419 U.S. 897 (1974). The Court said,

> [t]he reasoning of the Fifth and Second Circuits is persuasive in determining whether 18 U.S.C.A. § 2515 applies to domestic relations cases. The court in *Anonymous*, 558 F.2d at 677, recognized that Congress explicitly exempted such activity from coverage in 18 U.S.C. § 2510(5)(a)(i). In testimony before the House Committee to preserve the § 2510(5)(a)(i) exception in specific circumstance, it was stated "I take it nobody wants to make it a crime for a

father to listen in on his teenage daughter or some such related problem. *Id.* at 679. Similarly, the court reasoned "nobody wants to make it a crime for a father to listen in on conversations between his wife and his eight-year old daughter, from his own phone, in his own home." *Id.* The fact that the husband taped the conversations, which he permissibly overheard, is "a distinction without a difference." *Id.*

*Stewart*, 645 So.2d at 1321.

¶17. Steve asserts that *Simpson* and *Stewart* are factually distinct from the instant case and that their holdings are limited making them inapplicable. In *Simpson*, a wife was suing her ex-husband for civil damages under § 2520. She alleged that during their marriage he had illegally intercepted her telephone conversations with a third person because he suspected that she was being unfaithful. *Simpson* at 804. The issue for the Court was whether the interception by a husband using electronic equipment to make recordings of the conversations of his wife with a third party over the telephone in the marital home is included in the statutory proscription. The Court held that Title III does not prohibit a husband from recording his wife's telephone conversations with a third person in the marital home. *Id.* at 804-808, 810. The Court limited its holding to the specific facts before it, saying, " [o]ur decision is, of course, limited to the specific facts of this case. No public official is involved, nor is any private person other than the appellee, and the locus in quo does not extend beyond the marital home of the parties." *Id.* at 810.

¶18. Steve argues that *Simpson* is distinguishable because the recordings in this case were not intercepted by a spouse, and the recordings were not taped in the marital home. In the case before us, Carol was Steve's ex-spouse, and they had no marital home at the time of the tape-recordings.

¶19. Steve argues that *Stewart* is distinguishable from the present case because the Court could have based its decision on the fact that there was consent. Carol stipulated to the fact that she did not have the consent of Steve or Jane Ann before she taped them. She also testified to the fact that she never asked her children for consent, and did not know if they would have given the consent had she asked. However, the *Stewart* decision was not wholly based on consent. The Court found that the husband's taping of his wife in the marital home was excepted out of the wiretapping prohibition. It then said that even if it had not been excepted out by the business-use exception, there would have been an exception because the wife consented.

¶20. The situation in the present case does appear to be factually distinguishable from those in *Stewart* and *Simpson*. In both of those cases, one spouse taped another spouse in the marital home. In this case Steve and Carol are not spouses, and have no marital home. The Fifth Circuit Court and this Court found no violation of the federal wiretapping statute, because they found that those situations fell within the business-use exception. 18 U.S.C. § 2510(5)(a)(i). The same logic that was applied in *Stewart* and *Simpson* should be applied to the case before us today. If there is no prohibition against a spouse recording the conversations of another spouse within the marital home, then it follows that there should be no prohibition against a custodial parent recording the conversations of her children in the custodial home. Steve argues that the *Simpson* decision should not be extended beyond its particular facts, but we do not consider this decision an extension. The logic behind these cases is as follows. It is permissible to record what one could just as easily hear by picking up an extension phone. *Stewart* at 1321.

¶21. Steve's final argument on this issue is that Carol also, or in the alternative, violated state law by tape-recording conversations of Steve with his children without their consent. As such, he argues, the chancellor erred in admitting those tapes into evidence. In pertinent part, Section 41-29-529 of the Mississippi Code provides:

> A person whose wire, oral, or other communication is intercepted, disclosed or used in violation of this article shall have a civil cause of action against any person who intercepts, discloses, or uses or procures another person to intercept, disclose or use the communication, and is entitled to recover from the person:
>
> (a) Actual damages . . .
>
> (b) Punitive damages, and
>
> (c) A reasonable attorney's fee and other litigation cost reasonably incurred.

Mississippi's wiretapping prohibition statute also has a section similar to 18 U.S.C. § 2515. It provides:

> The contents of an intercepted wire, oral or other communication and evidence derived from an intercepted wire, oral or other communication may not be received in evidence in any trial, hearing or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this article . . .

Miss. Code Ann. § 41-29-503 (Supp. 1995).

¶22. The Mississippi wiretap prohibition is almost identical to the federal statute. However, the state statute is inapplicable to Carol. Miss. Code Ann. § 41-29-535(1993) provides:

> This article shall not apply to a person who is a subscriber to a telephone operated by a communication common carrier and who intercepts a communication on a telephone to which he subscribes. This article shall not apply to persons who are members of the household of the subscriber who intercept communications on a telephone in the home of the subscriber.

Clearly, the prohibition of wiretapping does not apply to Carol as she was a subscriber to a telephone operated by a communication common carrier who intercepted communications on her telephone.

¶23. For the foregoing reasons, we find that the chancellor did not err under federal or state law in admitting the tapes.

## II.

¶24. The next assignment of error Steve asserts is that the chancellor erred by not compelling Carol to produce all tape-recorded conversations she intercepted between Steve and his children. Carol testified at trial that she had other tapes at home, but that she had nothing to hide in the tapes and that she would be glad to bring them to court. Carol also testified that although she had not selectively left out certain tapes, she had brought to court the two tapes that would be best for her case.

¶**25.** Steve asserts that he made a Rule 34 discovery request, which was not a part of the record. This Court granted his motion to supplement the record, and it has since been supplemented. He argues that Carol was under an obligation to honor the tape request and supplement the request whenever new tape evidence was created. He asserts that this is especially true, because Carol testified in her deposition one month before trial that she was not taping Steve and the children. He argues that her use of the two selected tapes at trial was inherently unfair, and that he should have had access to all tapes.

¶26. This Court finds nothing in the record to suggest that Steve ever moved the court to compel Carol to produce all tapes. The chancellor can not be held in error for not compelling Carol to produce these tapes when Steve never moved him to compel. The only thing the record does show is that Carol admitted she had a few other tapes, that she had nothing to hide, and that she would be glad to produce them. Steve should have taken her up on her offer. This assignment of error is without merit, and the chancellor did not err by not compelling Carol to produce all tape-recorded conversations she intercepted between Steve and his children.

### III.

¶27. The standard of review in a child custody case is quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse. ***Williams v. Williams***, 656 So. 2d 325, 330 (Miss. 1995).

¶28. Steve contends that it was error for the chancellor to deny his Petition for Modification of Custody because it was against the overwhelming weight of the evidence. He asserts that he has proven a material change in circumstances adversely affecting the welfare of Michael. This Court has stated that: "[t]he prerequisites to a child custody modification are: (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody." ***Smith v. Jones***, 654 So. 2d 480, 486 (Miss. 1995). In order for this Court to say that the chancellor has not abused his discretion in these matters, there must be sufficient evidence to support his conclusions. *Id.* This Court has also noted that "[t]he 'totality of the circumstances' must be considered." ***Ash v. Ash,*** 622 So. 2d 1264, 1266 (Miss. 1993) (*citing* ***Tucker v. Tucker,*** 453 So. 2d 1294, 1297 (Miss. 1984)).

¶29. The chancellor, in his opinion, set out his findings very clearly. Those findings are well supported by the record. In his final analysis, the chancellor questioned whether there were justifiable circumstances present for splitting custody of the children, the legal precept being that it should not absent compelling circumstances. He said that there were some circumstances present. The first is Michael's strong desire to live with Steve and Jane Ann. Further, the chancellor suspected that Michael would continue to be a disruption in the Stanley household. Overall though, he found the circumstances not so compelling as to warrant a custody change resulting in split custody. He said:

> "I have pondered over this question and have come to the conclusion that the circumstances are not so compelling. There are several facts that lead to this conclusion: (1) Mrs. Stanley has been generous to a fault in allowing Mr. Wright visitation and telephone communications with the children. Mr. Wright has taken advantage of that by overly encouraging Michael over a prolonged period of time to come and live with him. Unwittingly or otherwise, Jane has participated in Mr. Wright's endeavor to win Michael and disrupt the Stanley household. (2)

Michael's disenchantment with his stepfather is a reason he gives for wanting to leave home but I perceive it as an excuse he uses for wanting to live with his father and stepmother. Mr. Stanley is certainly not perfect. He apparently uses "hell" and "damn" from time to time in front of the children and, on occasions, inappropriate expletives. But Mr. Stanley does not call the children bad or vile names to their faces nor does he appear to exhibit excessive exasperation toward them. His one serious mistake was when in frustration he referred to Michael in what he thought was a conversation with his wife as "your f------ brain damaged child." This remark, regrettably, was overheard by the children. However, aside from his occasional profanity, Mr. Stanley appears to have tried to make a good stepfather to these children. He has apparently gotten along well with Daniel and Nathan and has tried to do so with Michael. The problem with Michael is he has been so bent on living with his father that he has not seen the hand of friendship Mr. Stanley has extended to him. Michael is an emotional, self-centered child. He needs discipline, and all the parties recognize this, but beyond that, in my opinion, he needs some serious counseling. Mr. Wright denies that Michael needs professional help and has spurned Mrs. Stanley's suggestion in this regard. He believes all Michael needs is his father to discipline him. (3) In addition, there has been an accumulation of acts that Mr. Wright has engaged in since the divorce that raises a serious question about his temperament and judgment as they relate to the welfare of the children. They are: (a) his changing his life insurance policy to make Jane trustee for his children when there was no justifiable reason for so doing. (b) his suggestions to Mrs. Stanley that his monthly child support should be encumbered by some type of trust arrangement when there was no evidence of her prior misuse of these funds. (d) his naming on the baseball applications of his children his father as the one to notify in the case of an accident rather than their mother and the custodial parent. (e) his permitting the children to read the court proceedings in this case. (f) his suggestions to the children that they would be better off with him (g) insistence on delivering the children to the door of Mrs. Stanley's house on returning them following his visitation when they are of an age where such is totally unnecessary. (h) his encouraging Michael to keep written notes of incidents that occurred in the Stanley home. (i) his accusing Mrs. Stanley of being responsible for the present custody suit. (j) his abuse of Mrs. Stanley's generosity in allowing the children to call him on the telephone at reasonable times and to have visitation at times not specified in the divorce judgment. (k) his arranging for his father to take Daniel to a banquet in place of Mrs. Stanley without first determining if she wanted to attend. All of these acts in my mind evinces an excessive and unhealthy desire to control and influence the children and undermine their relationship with their mother. For the reasons stated above, the Court finds that custody of Michael should remain with his mother and that such would be to his best interest.

In the remainder of his opinion, the chancellor awarded Carol all of the relief she requested except that he did not hold Steve in contempt of court. Based on the totality of the circumstances, we can not say that the chancellor was manifestly wrong or clearly erroneous in his denial of Steve's Petition for Modification of Custody. His decision was not against the overwhelming weight of the evidence.

**IV**.

¶30. Steve's next assignment of error is that the chancellor erred in awarding attorney's fees and increased child support to Carol.

## A. Attorney Fees

¶31. This Court has stated with regard to an award of attorney's fees that "[a]s with alimony, the determination of attorney's fees is largely within the sound discretion of the chancellor." *Smith v. Smith,* 614 So. 2d 394, 398 (Miss. 1993). This Court has also ruled that "[i]f a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Martin v. Martin,* 566 So. 2d 704, 707 (Miss. 1990). In *Cheatham v. Cheatham,* 537 So. 2d 435 (Miss. 1988), this Court held that the chancellor abused his discretion in awarding attorney's fees where there was insufficient evidence in the record to establish the wife's inability to pay.

¶32. In the case at hand, the chancellor awarded Carol $7,800.00. In his opinion, the chancellor said, "[t]he Court is of the opinion that Mrs. Stanley is entitled to a reasonable attorney's fee for defending against Mr. Wright's Petition for Modification of Judgment and in prosecuting her counterclaim. The Court finds that Mrs. Stanley is without funds with which to pay a reasonable fee and that the amount of $7,800.00 sought by her is reasonable and was necessarily incurred."

¶33. At trial Carol testified that she was unable to pay her attorney's fees. The chancellor also accepted into evidence the financial statements of each party, to which admissibility was stipulated. These statements included W-2 forms, tax returns, as well as itemized income and expense statements. These financial statements show that Carol has net monthly take-home pay of $3,353.45 which includes $1,200.00 in child support from Steve and $4,246.00 in monthly expenses.

¶34. Steve asserts that the fact that Carol says she cannot pay her attorney's fees does not make it so, and that the case law requires more specific evidence than that. However, Steve cites no case law to support his position.

¶35. In *Crowe, v., Crowe,* 641 So. 2d 1100, 1105 (Miss. 1994), this Court held that the chancellor had sufficient evidence in the record to award attorney's fees where he had testimony and exhibits tending to show the ex-wife's monthly income and expenses. Based on the case law and the evidence the chancellor had before him, we can not say that the chancellor abused his discretion in awarding attorney's fees to Carol. There was sufficient evidence in the record for him to make a fair determination of whether Carol was able to pay her fees or not.

## B. Child Support

¶36. Steve's final argument is that the chancellor erred in awarding to Carol increased child support. The chancellor increased child support by $40.00 per child per month.

¶37. Steve argues that the chancellor erred by considering his gross income as opposed to his adjusted gross income. The chancellor found that Steve's gross income for 1995 would be approximately $91,000.

¶38. Miss. Code. Ann. § 43-19-101 sets out guidelines for child support. This court has said that these are guidelines and not absolute rules. *See Thurman v. Thurman,* 559 So. 2d 1014, 1017-1018 (Miss. 1990). Steve argues that the chancellor increased child support above the statutory guidelines by setting the figure based on gross income rather that adjusted gross income. For three children, the guidelines suggest that the parent paying child support should pay 22% of adjusted gross income.

Steve estimated that his adjusted gross income for 1995 would be $67,500. Twenty-two percent of $67,500 is $14,850. At $1,320.00 per month, Steve is now paying $15,840, or 23% of his estimated adjusted gross income. It should be noted that this adjusted gross income is estimated and that a change in one or more of the variables would change the percentage he is paying in child support

¶39. This Court has held that "a chancellor can depart from the guidelines with written findings of their inappropriateness." However, "without a written justification, such a departure is error by law and reversible." *Johnson v. Johnson,* 650 So. 2d 1281, 1288 (Miss. 1995).

¶40. In his opinion, the chancellor wrote;

> At the time of the divorce, Mr. Wright's agreed to pay $1,200.00 per month as child support and maintain life insurance and health insurance for the benefit of the children. To his credit, he initially agreed to pay a sum substantially in excess of that which was required of him by the guidelines. Even at his present salary, he is contributing about what would be required by the guidelines. However, in view of Mr. Wright's substantial increase in income since the divorce, the increase in cost of living since that time, the increase in the cost of now maintaining older children, I have concluded that a modest increase in child support would be appropriate and equitable. Accordingly, I find that child support for each child should be raised from $400.00 per month to $440.00 per month commencing October 1, 1995.

¶41. Steve argues that the chancellor increased his child support obligation in excess of the guidelines without making a written finding justifying his departure. We disagree. The chancellor did justify his departure from the guidelines at the same time justifying the modest increase. As such, there is no merit in this assignment of error.

## CONCLUSION

¶42. We hold that the chancellor did not commit reversible error in this case, and that all assignments of error are without merit.

**¶43. AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**