**Beverly Camp SIMPSON,**
**Plaintiff-Appellant,**

v.

**John G. SIMPSON, III, Defendant-**
**Appellee.**

**No. 73–1521.**

United States Court of Appeals,
Fifth Circuit.

March 8, 1974.

Rehearing and Rehearing En Banc
Denied April 24, 1974.

Robert Sellers Smith, Huntsville, Ala., Emily Carssow, ACLU, Atlanta, Ga., for plaintiff-appellant.

Glenn F. Manning, Huntsville, Ala., for defendant-appellee.

Before BELL, COLEMAN and RONEY, Circuit Judges.

BELL, Circuit Judge:

The issue presented on this appeal is the scope of the wire interception provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. §§ 2510–2520. Is the interception by a husband using electronic equipment of the conversations of his wife with a third party over the telephone in the marital home included in the statutory proscription? The context in which we must address this issue is a suit by the wife for civil damages against the husband, pursuant to Section 2520. The district court answered in the negative and we affirm, although the language and legislative history of the Act leaves the question in considerable doubt.

## THE FACTS

Harboring uncertainties as to his wife's faithfulness, appellee obtained a device for tapping and recording telephone conversations. He attached the device to phone lines within his home, and thereby intercepted conversations between his wife and another man. The conversations were mildly compromising establishing that the other man was making advances, and that while the wife was resisting, she was not doing so in a firm and final fashion. Convinced that he had "caught her," appellee played the tapes, or portions thereof, to various neighbors and family members. He also played them for a lawyer, on whose advice the wife agreed to an uncontested divorce.

After the divorce appellant brought this action. Failing below, she has appealed, arguing before this court that her claim is bolstered by constitutional protections of privacy and emerging concepts of women's rights. We take a more pedestrian view of the case, and are of the opinion that it involves nothing more nor less than statutory construction. If Congress intended to extend such a remedy to persons in her position, appellant prevails; if it did not, she fails. This being the case, we turn to the statute and its history.

## TITLE III

Title III of the Omnibus Act broadly prohibits the interception [1] or disclosure of a wire communication,[2] subject to stated exceptions which are not relevant

1. 18 U.S.C.A. § 2510(4) & (5):
   "(4) 'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.
   (5) 'electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire or oral communication other than—
   (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;
   (b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal; . . . ."

2. 18 U.S.C.A. § 2510(1):
   "(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications; . . . ."
   "Paragraph (1) defines "wire communication' to include all communications carried by a common carrier, in whole or in part, through our Nation's communications network. The coverage is intended to be comprehensive."

to this case.[3]  Violators are subject to criminal penalties of up to $10,000 or five years.[4]  They are also civilly liable to persons whose communications they intercept or disclose.[5]

The naked language of Title III, by virtue of its inclusiveness, reaches this case.  However, we are of the opinion that Congress did not intend such a far-reaching result, one extending into areas normally left to states, those of the marital home and domestic conflicts.[6]  We reach this decision because Congress has not, in the statute, committee reports, legislative hearings, or reported debates indicated either its positive intent to reach so far or an awareness that it might be doing so.  Given the novelty of a federal remedy for persons aggrieved by the personal acts of their spouses

---

Senate Judiciary Comm., Senate Report No. 1097, 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2178.

3. See 18 U.S.C.A. § 2511(2) & (3).

The district court seems to have placed some reliance on the exception contained in § 2511(2)(d):

"It shall not be unlawful under this chapter [§§ 2510–2520 of this title] for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

We think this inapposite for two reasons.  First, the exemption requires consent of a "party to the communication," and " 'party' would mean the person actually participating in the communication."  Senate Judiciary Comm., Senate Report No. 1097., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2182.

Second, even if we were to hold that the husband is capable of consenting for the wife, or that the wife's use of the marital home's phone implied consent to be overheard by the husband, the consent would be vitiated by the purpose of committing an "injurious act."  See 114 Cong.Rec. 14694 (1968), where this proviso is stated to reach consensual recordings "made for the purpose of blackmailing the other party, threatening him, or publicly embarassing him."

4. 18 U.S.C.A. § 2511(1):

"(1) Except as otherwise specifically provided in this chapter [§§ 2510–2520 of this title] any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; . . .

(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both."

5. 18 U.S.C.A. § 2520:

"Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter [§§ 2510–2520 of this title] shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter [§§ 2510–2520 of this title] or under any other law."

6. We have no doubts, however, that Congress has the power to legislate the result sought by appellant, under its authority to control interstate commerce.

within the marital home,[7] and given the severity of the remedy seemingly provided by Title III, we seek such indications of congressional intent and awareness before extending Title III to this case.

Our independent search of legislative materials has been long, exhaustive, and inconclusive. To summarize the results, we have found no direct indications that Congress intended so much, and only several scattered suggestions that it was aware that the statute's inclusive language might reach this case. In support of this general statement, we now turn to a specific discussion of the statute and its history.

An initial observation about Title III is that it is a part of a crime control act. In the Omnibus Act Congress sought generally to strengthen the position of law enforcement officials, *see* Senate Judiciary Comm., Senate Report No. 1097, 1968 U.S.Code Cong. & Admin.News, p. 2112.[8] Further, the Senate report states that, "The major purpose of title III is to combat organized crime." *Id.* at U.S.Code Cong. & Admin.News 1968, p. 2157. Five of Title III's eleven sections deal almost exclusively with procedures for utilizing electronic surveillance against criminal activities, 18 U.S.C.A. §§ 2514, 2516–2519, and its principal goal is surveillance standards that satisfy the constitutional requirements of Berger v. New York, 1967, 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040, and Katz v. United States, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576. See *Senate Report*, pp. 2161–2163.

Be this as it may, Title III also was intended to protect individuals against invasions of their privacy by sophisticated surveillance devices. *Senate Report*, p. 2153. Thus, the Senate report introduces its section on the "Problem" with the following paragraph:

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

*Id.* at U.S.Code Cong. & Admin.News 1968, p. 2154. The report further states that, "To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers . . . ." *Id.* at U.S.Code Cong. & Admin.News 1968, p. 2153. The nature and breadth of Congress's response to private surveillance is fairly indicated by the Senate report's section entitled "Prohibition," quoted in full in the margin.[9]

---

7. We note that not only would the result sought by appellant create a federal remedy for marital grievances, it would also override the interspousal immunity for personal torts accorded by the majority of states. Discussions of the rules followed by the various states may be found at Clark, The Law of Domestic Relations, 252–56 (1968), and Prosser, The Law of Torts, 861–64 (4th ed. 1971).

8. Hereinafter cited as *Senate Report*.

9. "Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited. It is not enough, however, just to prohibit the unjustifiable

For our purposes it must be pointed out that we have herein quoted virtually every phrase of the report's text dealing with private surveillance—amounting to less than one of the ten pages about Title III, the balance concerning electronic surveillance by law enforcement officials. Not only does the report, like the act, focus on crime control, but it also contains no clear indication that Congress intended to intrude into the marital relation within the marital home. We thus have considered it necessary to consult the extensive legislative hearings on the subject, the better to gauge Congress's intent and awareness.[10]

The impression left by these hearings is similar to that produced by the report—the focus was official use of surveillance devices, with little explication of how far the private prohibition should extend. This is strikingly true of the hearings immediately preceding passage of Title III. While there are occasional references to the fact that the bill would prohibit private use of electronic surveillance techniques,[11] there are no substantive discussions of the probable or desired reach of the prohibition. Earlier hearings also accorded little attention to private users. For example, we have found in Sen. McClellan's 1966 hearings only three relevant sentences.[12]

interception, disclosure, or use of any wire or oral communications. An attack must also be made on the possession, distribution, manufacture, and advertising of intercepting devices. All too often the invasion of privacy itself will go unknown. Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings. Each of these objectives is sought by the proposed legislation."
*Senate Report*, U.S.Code Cong. & Admin. News 1968, p. 2156.

10. Our research has involved the following hearings:
I. Hearings on Wiretapping, The Attorney General's Program, Before the Senate Judiciary Comm., 87th Cong., 2d Sess. (1962).
II. Hearings on Invasions of Privacy, Before the Subcomm. on Admin. Practice & Procedure of the Senate Judiciary Comm., pts. 1–6, 89th Cong. (1965–1966).
III. Hearings on Criminal Laws and Procedures, Before the Subcomm. on Criminal Laws & Procedures of the Senate Judiciary Comm., 89th Cong., 2d Sess. (1966).
IV. Special Inquiry on Invasion of Privacy, Before the Special Subcomm. on Invasion of Privacy of the House Gov't Operations Comm. 189th Cong., 1st Sess. (1965).
V. Hearings on the Right of Privacy Act of 1967, Before the Subcomm. on Admin. Practice & Procedure of the Senate Judiciary Comm., pts. 1 & 2, 90th Cong., 1st Sess. (1967).

VI. Hearings on the Anti-Crime Program, Before Subcomm. No. 5 of the House Judiciary Comm., 90th Cong., 1st Sess. (1967).
VII. Hearings on Controlling Crime Through More Effective Law Enforcement, Before the Subcomm. on Criminal Laws & Procedures of the Senate Judiciary Comm., 90th Cong., 1st Sess. (1967).
Citations to those hearings will be by the appropriate Roman numeral. E. g., the hearings on the Right of Privacy Act of 1967 will be cited as *Hearings # V*.

11. For example:
Congressman McClory: "I am talking about a device being put on by an official, by the police department, because we are opposing in this legislation and all legislation, any private eavesdropping." *Hearings* #VI, at 956 (see note 10, *supra*).
In the same hearings, at 1045, Prof. G. Robert Blakey noted that the "two major private uses" of electronic surveillance equipment were in commercial eavesdropping and "domestic relations investigations." He made a similar comment at *Hearings # V*, pt. 2, at 413.

12. Sen. McClellan (describing a bill similar to Title III: "This bill outlaws all private wiretapping."
*Hearings* #III, at 2 (see note 10, *supra*).
Sen. McClellan (addressing Sen. Edward V. Long, who was testifying about the hearings on the subject previously held by his Subcommittee on Administrative Practice & Procedure):
"Then you agree with me that we should make this law as strong as possible, and go a far as it is possible to go, to absolutely outlaw it, except in such cases as Congress may, in its wisdom, permit wiretapping under orders of a Court in certain rather exceptional cases as a matter of necessity in law enforcement."

Similarly, of Sen. Long's six-part 1965–1966 hearings, four parts dealt exclusively with government surveillance, and one with "service observing" by telephone companies; Part 5 dealt in part with private use,[13] although much of it concerned government serveillance practices.

■ Of what testimony there was about private surveillance, only a minor portion was with reference to the marital setting. The only relevant passages which we have found, in hearings stretching over five years, are set forth in the margin.[14] It should be noted that the concerns and information in these passages are primarily directed towards the involvement of private investigators in marital conflicts. Indeed, were appellant seeking to recover from a third party, we could not, on the basis of this legislative history, accept the defense that

Sen. Long:
"Let me say this. I agree with you entirely that there should be a very, very strict law prohibiting wiretapping."
*Id.* at 79.

13. Sen. Long:
"The three large areas of snooping in this [non-governmental] field are (1) industrial (2) divorce cases, and (3) politics. So far, we have heard no real justification for continuance of snooping in these three areas. If any justification exists, we will probably hear about it in the next few weeks as we expect to explore this terrain thoroughly."
*Hearings* #II, pt. 5, at 2261 (see note 10, *supra*).

14. The following is from an article entitled "Is Big Brother Taping You?", by Arthur Whitman, from Tape Recording, Feb. 1965, reprinted in *Hearings* #II, pt. 1, at 18 (see note 10, *supra*):
"Individuals involved in civil suits bug each others' premises to gather useful information and evidence. The prime area for this is divorce actions, particularly in states with restrictive codes. So little is sacred in this line of endeavor that bugs are routinely discovered under the beds of estranged husbands and wives who suspect each other of errant ways. The latest twist in this game is the installation of tiny radio transmitters in cars that relay. to prying ears and tape recorders any conversations or other sounds produced by drivers and passengers."
Richard Gerstein, Dade County District Attorney:
"Nonetheless, *it is routine procedure in marital disagreements* and other civil disputes for private detective agencies, generally with full knowledge of the lawyers, to tap telephones."
*Hearings* #II, pt. 2, at 1009 (see note 10, *supra*).
Bernard Spindel, private investigator/electronic technician (explaining the `10%` ·of his work that he refers to as the "affirmative, defensive type of eavesdropping"):

"In other words, it is restricted to defense in the sense that a man believes that there is some wrongdoing within his own premises; we will help him electronically obtain the evidence of such wrongdoing. But it is restricted within the confines of the law and within a man's own home or premises, where he has absolute control, whether it be his office or his home or his factory."
*Id.*, pt. 5, at 2262.
Ben Jamil, president of a firm which sold significant quantities of electronic surveillance equipment to persons other than public officials and license private investigators:
"I don't feel, however, that I am in any position to judge the rightness or wrongness of this mother eavesdropping on her daughter with one of my devices. Any more than I have the right to determine whether a suspicious husband or wife is entitled to snoop on his or her mate, a businessman is within his rights to determine whether an employee is guilty of pilferage . . . ."
*Id.* at 2365.
John W. Leon, a private investigator, noted that 80% of his domestic work involved husbands spying on wives. He described the "10-day blitz," named for the fact that if it uncovers nothing within ten days you may as well forget the theory that your spouse is playing around. The blitz includes telephone taps, car and room bugs, voice-activated tape recorders, and an automatic camera, all of which could be purchased for private use for $400. He testified that previously he would have employed the devices himself for a client, but *no longer did so because of F.C.C. regulations.*
When questioned about the ethics of these practices, he replied:
"[W]e have found statistically that once the truth is out in any domestic squabble, there is a 50% better chance of a couple being reconciled. Every time we make a case, I practically feel like a surgeon who is cutting out a cancer."
*Id.* at 2411.

the interceptions were authorized by the husband. However, to our minds a third-party intrusion into the marital home, even if instigated by one spouse, is an offense against a spouse's privacy of a much greater magnitude than is personal surveillance by the other spouse. The latter, it seems to us, is consistent with whatever expectations of privacy spouses might have vis-a-vis each other within the marital home.[15]

When we narrow our search to material relevant to this ultimate issue, that of whether Congress intended its regulations to invade the realm of personal acts within the marital home, we find very little indeed. We think that only two passages support appellant's case, these being the testimony of Ben Jamil and John W. Leon, quoted in note 14. These statements suggest congressional awareness that private individuals were using electronic surveillance techniques within their own homes. However, they do not support the proposition that Congress was concerned that such activities took place.[16]

### OTHER CONSIDERATIONS

■ Given this inconclusive legislative history, we think two other factors are important. First, it is clear that Congress did not intend to prohibit a person from intercepting a family member's telephone conversations by use of an extension phone in the family home—subsection (5)(a)(i) of section 2510 directly covers this point.[17] If there is a convincing distinction between this clearly acceptable overhear and the overhear accomplished by appellee, we fail to see it. In fact, we think the (5)(a)(i) exemption is indicative of Congress's intention to abjure from deciding a very intimate question of familial relations, that of the extent of privacy family members may expect within the home vis-a-vis each other.

■ Second, we note that not only does Title III have the primary goal of controlling crime, but that it also prescribes criminal sanctions for its violators. That is, if appellant prevails here then appellee is subject to severe criminal penalties, assuming of course that the prosecution could meet the higher standards of proof required for criminal convictions. We thus are bound by the principle that criminal statutes must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed. *See* Kordel v. United States, 1948, 335 U.S. 345, 349, 69 S.Ct. 106, 109, 93 L.Ed. 52, 56. We consider this basic due process principle to be of considerable importance in this case, in light of our own inability to determine from the statute and its legislative history whether one is prohibited from taping one's spouse's conversations within one's own home.

---

15. We are aware that there is no statutory requirement of an expectation of privacy in wire communications. Compare § 2510(1), note 2, *supra*, *with* § 2510(2).

"(2) 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;
. . ."
We are here noting only that it is a large jump from a prohibition on third-party surveillance to one on personal spousal surveillance.

16. We have also searched congressional debates, but without finding any comments sufficiently relevant to merit printing here. See 114 Cong.Rec. 12280–84, 12294–98, 12982–13000, 14469–86, 14693–751, 16274–98 (1968).

17. See note (1), *supra*.
The meaning of the phrase "being used by the subscriber or user in the ordinary course of its business" becomes clear in light of objections to the original version, which did not contain this phrase. Prof. Herman Schwartz, appearing for the A.C.L.U., stated his fear that the original version would permit intruders or other unauthorized persons to use extension phones without being subject to the prohibitions and penalties of the act. In the course of this objection, he made the following comment:

"I take it nobody wants to make it a crime for a father to listen in on his teenage daughter or some such related problem.
. . . But this bill does not go to that and goes beyond that." *Hearings* #VI, at 989 (see note 10, *supra*).

## CONCLUSION

As should be obvious from the foregoing, we are not without doubts about our decision. However, we have concluded that the statute is not sufficiently definite and specific to create a federal cause of action for the redress of appellant's grievances against her former husband. Our decision is, of course, limited to the specific facts of this case. No public official is involved, nor is any private person other than appellee, and the *locus in quo* does not extend beyond the marital home of the parties.

Affirmed.